■ ROY MERZ et al., Appellants-Respondents, v J. TAD SEAMAN et al., Respondents-Appellants. (Action No. 1.) ROY MERZ et al., Appellants-Respondents, v McGUIRK, LEVINSON, ZECCOLA, SEAMAN, REINEKE & ORNSTEIN et al., Respondents-Appellants. (Action No. 2.) [697 NYS2d 290] —In two related actions to recover damages for legal and accounting malpractice, the plaintiffs appeal from an order of the Supreme Court, Orange County (Owen, J.), dated June 9, 1997, which granted the defendants' respective motions to dismiss the complaints on the ground that they were time-barred, and the defendants separately cross-appeal from so much of the same order as failed to grant those branches of their respective motions which were for summary judgment dismissing the complaints on the ground that the plaintiffs failed to establish a prima facie case of legal and accounting malpractice.

Ordered that the cross appeals are dismissed as the defendants are not aggrieved by the order appealed from (*see,* CPLR 5511); and it is further,

Ordered that the order is affirmed; and it is further,

Ordered that the defendants appearing separately and filing separate briefs are awarded one bill of costs.

The defendants' cross appeals must be dismissed because they are not aggrieved by the order appealed from. However, on the plaintiffs' appeal the defendants may raise, as an alternative ground for affirmance, the argument that the plaintiffs did not establish a prima facie case of legal and accounting malpractice (*see, Parochial Bus Sys. v Board of Educ.,* 60 NY2d 539). Upon over review of the record we conclude that the Supreme Court erred in dismissing the complaint as time-barred but that the defendants are correct in asserting that the complaint must be dismissed because of the plaintiffs' failure to establish a prima facie case. Accordingly, we affirm the order appealed from.

Over a period of 20 years, the plaintiff Roy Merz was employed by the Bank of New York in Newburgh, New York, where he rose to the rank of vice president. During the course of his banking career, Merz often reviewed contracts, mortgages, personal guarantees, and other financial agreements.

While Merz was employed at the bank, he met a customer named Clifford Williamson, who was the president of Royalty Distribution Services, Inc. (hereinafter Royalty), a storage, packaging, and distribution center located in Newburgh. Sometime in 1985, Williamson expressed an interest in hiring Merz and eventually selling Royalty to him. After several months of negotiating, Williamson agreed to employ Merz for two years, at a substantial increase in salary plus incentive bonuses, and with a right of first refusal to purchase Royalty. At the time Merz agreed to this arrangement, he knew that Royalty's primary client, representing 90-95% of Royalty's business, was Xerox Learning Systems, a/k/a Times Mirror, a/k/a Learning International (hereinafter LI). He also knew that Royalty's five-year contract with LI was due to expire on August 31, 1988, and that there was no guarantee of renewal. Merz engaged the defendant Tad Seaman, an attorney, to help in the preparation of his employment contract.

Merz worked as general manager of Royalty for approximately a year, learning the business, becoming acquainted with key personnel at LI, and reviewing Royalty's financial records, which had only recently begun to reflect a slender profit. Merz also learned that an individual named John E. Sgombick,

president of Metro-Pack, Inc., a spin-off of Royalty, owed between $130,000 and $150,000 to Royalty.

In December 1987 or January 1988, Merz began negotiating with Williamson to buy Royalty. In a letter to Merz dated April 22, 1988, Williamson's attorney outlined the basic terms of the parties' purchase agreement, including the one million dollar purchase price. The payment schedule included, *inter alia*, a deferral provision in the event that LI failed to renew its contract with Royalty. Merz hired Seaman once again to prepare the purchase agreement and related documents based upon this letter outline. According to both Merz and his wife, Gail, Seaman reviewed the terms of the final agreement paragraph by paragraph with them, explaining each of its provisions, including their personal guarantees. Although an accountant named Levitan warned Merz in early May 1988 that it was risky to proceed without any assurance from LI that it planned to renew its contract with Royalty, Merz hired another accountant, the defendant Lawrence B. Goodman, to form a corporation, No Big Deal, Inc. (hereinafter No Big Deal), to insulate him from liability and to alleviate the tax consequences of owning Royalty. However, Merz ignored Goodman's advice regarding how to structure the relationship between No Big Deal and Royalty, and that Merz should collect a commission from No Big Deal rather than a salary from Royalty. As a result, when the Internal Revenue Service audited Merz in 1991 it assessed additional taxes and penalties of over $100,000.

Paragraph 16 of the final purchase agreement expressly declared that the contract was "not conditional on the Learning International Contract being renewed". A rider prepared by Seaman provided for a pro rata reduction in price for each year that the LI contract was not renewed over the next five years. Although the contract included a clause stating that Williamson would not compete with Royalty, the agreement did not obligate Williamson to act as a consultant to Royalty. An accompanying financial statement listed, *inter alia*, the Sgombick note with an amortization schedule. At the closing on May 23, 1988, Merz signed the purchase agreement and rider in his capacity as president of No Big Deal and as an individual guarantor. In addition, he and his wife personally guaranteed an accompanying note in the amount of $970,000, which they secured with corporate stock and a mortgage on their home.

Two months later, in July 1988, LI renewed its contract for only one year, and Williamson was diagnosed with brain can-

cer from which he later died. In December 1988, Sgombick announced that he considered his debt to Royalty to be fully discharged based on a heretofore undisclosed "rent adjustment" agreement with Williamson. In 1989 LI did not renew its contract with Royalty, and Merz defaulted under the purchase agreement.

Williamson's estate commenced an action against the Merzs and No Big Deal seeking, *inter alia*, to foreclose the mortgage on the Merzs' home. The Merzs hired the defendant Paul Ornstein, one of Seaman's partners, to represent them. When Williamson's estate rejected Ornstein's offers of settlement, Ornstein counseled the Merzs regarding the possibility of filing for bankruptcy, advising them that upon filing the bankruptcy petition the foreclosure action would be stayed. Merz filed for bankruptcy but the bankruptcy court lifted the automatic stay with respect to the mortgage foreclosure action, and Merz discharged Ornstein. At the trial of the foreclosure action, the Merzs appeared *pro se*. The court awarded judgment in favor of Williamson's estate, and expressly rejected the Merzs' claim that there had been any fraudulent misrepresentations on Williamson's part with respect to the Sgombick note, the prospects for renewal of the LI contract, and/or Williamson's own health and his willingness to act as a consultant to Royalty after he sold the business.

Thereafter on April 13, 1994, the Merzs commenced the instant action against the defendants Seaman and Ornstein and their firm, as well as against the accountant Goodman and his firm, claiming that "but for" these defendants' professional negligence and malpractice the Merzs would not have bought Royalty and suffered all of the above-described financial damage. Specifically, the plaintiffs alleged that the defendants had not properly advised them about the repercussions to Royalty if LI failed to renew its contract, and had not sufficiently explored the true value of the Sgombick note.

After discovery, the defendants moved for summary judgment dismissing the complaint as time-barred and on the ground that the plaintiffs did not establish a prima facie case of either legal or accounting malpractice. The Supreme Court erred in granting the motion on the ground that the action was barred by the three-year Statute of Limitations for actions based on nonmedical malpractice (CPLR 214 [6]; L 1996, ch 623, as amended). Although the Legislature provided that the amendment "shall take effect immediately" (L 1996, ch 623, as amended), the statute cannot be applied retroactively to dismiss an action that was viable at the time it was filed. Such

a result would impair vested rights and violate due process (*see, Vogel v Lyman,* 246 AD2d 422; *Ruffolo v Garbarini & Scher,* 239 AD2d 8).

Nevertheless, we affirm the order dismissing the complaints on the ground that the plaintiffs failed to establish a prima facie case. Specifically, there is no evidence to support a finding that the alleged negligence proximately caused the plaintiffs' injuries (*see, e.g., Metz v Coopers & Lybrand,* 210 AD2d 624; *Zeitlin v Greenberg, Margolis, Ziegler, Schwartz, Dratch, Fishman, Franzblau & Falkin,* 209 AD2d 510; *Parker Chapin Flattau & Klimpl v Daelen Corp.,* 59 AD2d 375). The record establishes that the plaintiff Roy Merz was an experienced banker who was well aware of the risks involved in buying Royalty, a company with a single major client whose contract was coming up for renewal, and with a recent history of negative net income. Merz had worked with Williamson for a year, had full access to Royalty's books, and was personally acquainted with John E. Sgombick. Merz was therefore in the best position to evaluate Royalty's overall finances, the prospects for the LI contract renewal, and the terms of the Sgombick note. While it is unfortunate, as the dissent points out, that the plaintiffs subjected themselves to substantial personal liability, the complaint does not allege either that the defendants' malpractice lay in advising the plaintiffs to personally guarantee their debt to Williamson, or that the defendants were responsible for the foreclosure action commenced by Williamson's estate or for the plaintiffs' difficulties with the IRS. Rather, the sole specific charge in the complaint is that the defendants did not properly investigate the terms of the Sgombick note and failed to warn the plaintiffs of the possible repercussions to Royalty if LI did not renew its contract. Even had the concerns raised by the dissent been advanced in the complaint, however, it must be supposed that Merz, as a banker, understood as well as anyone the consequences of a mortgage and a personal guarantee. In addition, the plaintiffs admitted that Seaman had explained everything about the Royalty transaction to them before they signed the contract and guarantee. To the extent that No Big Deal did not provide an ideal tax shelter for the plaintiffs, the record indicates that Roy Merz ignored Goodman's advice regarding the financial structuring of his enterprise.

Accordingly, the defendants are entitled to summary judgment dismissing the complaint. Bracken, J. P., Friedmann and Goldstein, JJ., concur.

McGinity, J. concurs in part dissents in part and votes to

dismiss the cross appeals of the defendants, reverse the order appealed from, and deny the defendants respective motions for summary judgment with the following memorandum: While I agree with the majority that the action is not time-barred, I disagree that the plaintiffs did not establish a prima facie case of legal and accounting malpractice.

This appeal involves the plaintiffs' acquisition of Royalty Distribution Services (hereinafter Royalty), a storage and distribution business. They seek to recover damages for malpractice based on the legal and accounting advice they received prior to the closing. The plaintiff Roy Merz was employed as general manager of Royalty for one year prior to the purchase and therefore was fully familiar with its operations and customers. He was friendly with Clifford Williamson, Royalty's president who hired Merz and gave him the right of first refusal to purchase the business. Merz retained a member of the defendant law firm to prepare his employment contract which took approximately 25 hours to draft. The plaintiffs thereafter retained the defendants to render legal and financial advice as well as to serve as consultants throughout the course of negotiations for the sale of Royalty. Pursuant to the terms of the one million dollar transaction, the plaintiffs were obliged to pay Williamson in installments over a period of years.

In connection with the purchase, the plaintiffs were advised by the defendants to form a separate corporation with the intent that this corporation would purchase Royalty in order to insulate the plaintiffs from personal liability and to obtain certain tax advantages. Of critical importance to the purchase was the status of the contract of Royalty's major client which generated some 90-95% of its income. It is uncontroverted that this contract was to expire shortly after the scheduled date of the closing of the sale. In addition, a major asset of Royalty, listed as a receivable, was a note in the amount of $130,000 which was to be transferred to the plaintiffs in the transaction.

Notwithstanding the expressed concern of the plaintiffs to limit their personal liability, the plaintiffs allege that they were advised and counseled to grant the seller, as security for the note, a mortgage on their personal residence as well as guarantees secured by personal assets. The plaintiffs also allege that defendants failed to verify the status of the $130,000 note and failed to perform due diligence with respect to the intent of the Royalty's major client to renew its contract.

Insofar as is relevant to this appeal, subsequent to the closing, the major client of the business renewed its contract for only one year and thereafter did not renew the contract. In ad-

dition, the holder of the $130,000 note alleged that the note was paid in full on the basis of a separate agreement he had with Clifford Williamson. As a result, the plaintiffs had difficulty meeting their financial obligations under the purchase agreement. Clifford Williamson died, and his estate instituted foreclosure proceedings on the security posted by the plaintiffs. Thereafter, the plaintiffs filed for bankruptcy. In addition, the corporation that the plaintiffs formed, upon the advice of the defendants to carry out the purchase, rather than creating tax advantages, caused a substantial tax obligation to the plaintiffs.

It is evident that one of the overriding objectives of the plaintiffs in connection with the purchase of Royalty was to protect themselves from personal liability. Indeed, the plaintiffs allege that they were advised to form a corporation to insulate them from liability and alleviate the tax consequences connected with the purchase of Royalty. Notwithstanding this paramount concern, the plaintiffs allege that the defendants counseled them to sign personal guarantees in the transaction which ultimately redounded to their financial detriment. The plaintiffs essentially claim herein that their financial difficulties with respect to the subject transaction resulted from the poor advice that they received from the defendants. In my view, plaintiffs' allegations as set forth in their complaint that they sustained damages as a result of the defendants' conduct were sufficient to warrant a trial of this action (*cf., Metz v Coopers & Lybrand,* 210 AD2d 624; *Zeitlin v Greenberg, Margolis, Zeigler, Schwartz, Dratch, Fishman, Franzblau & Falkin,* 209 AD2d 510).