Long Is. Pine Barrens Socy., Inc. v County of Suffolk (2025 NY Slip Op 25119)

[*1]

Long Is. Pine Barrens Socy., Inc. v County of Suffolk

2025 NY Slip Op 25119

Decided on May 20, 2025

Supreme Court, Suffolk County

Whelan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on May 20, 2025
Supreme Court, Suffolk County

Long Island Pine Barrens Society, Inc., KINGS PARK COMMUNITY ASSOCIATION, INC., RICHARD AMPER, as Executive Director and Individually, THOMAS CASEY, ROBERT MCGRATH, DAN BURKE, FRANCIS LOMBARDO, JOHN VENIR and RICHARD COGGINS, Plaintiff,

against
County of Suffolk, SUFFOLK COUNTY LEGISLATURE, SUFFOLK COUNTY EXECUTIVE STEVE BELLONE and SUFFOLK COUNTY KINGS PARK SEWER DISTRICT #6, Defendants.

Index No. 600050/2022

LAW OFFICE OF PAUL SABATINO II
Attys for Plaintiffs 1617 New York Ave.
Huntington Station, NY 11746
SUFFOLK COUNTY DEPARTMENT OF LAW
Attys for the Defendants 100 Veterans Memorial Hwy.
PO Box 6100
Hauppauge, NY 11788

Thomas F. Whelan, J.

Upon the following papers read on these motionsfor summary judgment: Notice of Motion and supporting papers NYSCEF Docs. 84 - 168; Notice of Cross Motion and supporting papersNYSCEF Docs. 172 - 195; Answering Affidavits and supporting [*2]papersNYSCEF Docs. 199 - 205 ; Replying Affidavits and supporting papers NYSCEF Docs. 209 - 213; Other NYSCEF Docs. 223-230; (and after hearing counsel in support and opposed to the motion) it is,
ORDERED that plaintiffs' motion for summary judgment (#002) is granted in part and denied in part, and it is further;
ORDERED that defendants' cross-motion for summary judgment (#003) is granted in part and denied in part, and it is further;
ORDERED that the parties are to submit judgment on notice, in keeping with this determination.
Issues that implicate the Separation of Powers Doctrine are rarely addressed by this Court. However, this controversy, which has spanned ten years, presents just such a conflict that must now be resolved. The environmental issues are important, as are the budgetary ones facing the County of Suffolk. Yet, in seeking to solve the problem, each branch of government must respect the constitutional powers of the others. In one of the three conflicts of this case, the separation of powers was violated. This decision seeks to restore the constitutional balance.
Background
The importance of the Suffolk County Drinking Water Protection Program (DWPP) was set forth, in detail, by the Appellate Division, Second Department, in its November 14, 2014 Decision and Order (122 AD3d 688):
In 1987, Suffolk County amended the Suffolk County Charter to add the current article XII, known popularly as the Suffolk County Drinking Water Protection Program (hereinafter the DWPP). The overall goal of the DWPP is to protect the County's drinking water supply and land in the Long Island Pine Barrens region of the County, which contains a significant drinking water aquifer. The various provisions of the DWPP are designed to permanently protect Pine Barrens acreage in the deep water recharge area of the County, to support water quality protection programs, and to provide for a rational program of county tax stabilization (see Local Law No. 40-1987 of County of Suffolk). Suffolk County enacted the DWPP by an affirmative public referendum (see Local Law No. 40-1987 of County of Suffolk §§ 3, 6).
(Long Is. Pine Barrens Socy., Inc. v County of Suffolk, 122 AD3d 688, 688-89 [2d Dept 2014]).

The DWPP is codified as Article XII of the Suffolk County Charter. Pursuant to subsequent amendments, the DWPP can only be modified, amended, repealed or altered after approval by a public referendum. In 2011, the County Legislature sought to amend the DWPP but never submitted the proposed amendment to the voters for a referendum. Plaintiffs commenced an action in 2011 to declare any allocation of funds arising out of the 2011 amendment to be illegal, null, and void. The Appellate Division agreed and found the 2011 amendment to be illegal, null, and void, remitting the matter to the Supreme Court for a judgment declaring same (id).
As further detailed by the Second Department in its 2014 Decision and Order:
Significantly, the Amendment authorized certain funds that had previously been dedicated for purposes set forth in the DWPP to be used instead to retire bonded indebtedness or for a retirement contribution reserve fund unrelated to the protection of the Pine Barrens or the drinking water supply in the County. Thus, the Amendment redirected dedicated DWPP funds to general budgetary purposes.
(Long Is. Pine Barrens Socy., Inc. v County of Suffolk, 122 AD3d at 689).

Upon remand, following a dispute over which judgment to be entered, the matter once again found its way to the Second Department (173 AD3d 1154), which clearly held as follows, in describing the judgment to be issued:
[I]t should also have contained provisions directing the defendants to take all actions and make all budgetary adjustments as are necessary to transfer $29,409,109 from the Suffolk County General Fund (Fund 001) to the Suffolk County Assessment Stabilization Reserve (Fund 404) and to conform all future Suffolk County Operating Budgets to article XII of the Suffolk County Charter as adopted via mandatory public referendum.
(Long Is. Pine Barrens Socy., Inc. v County of Suffolk, 173 AD3d 1154, 1156 [2d Dept 2019]).
Upon this remand, the Supreme Court issued a Judgment, dated December 12, 2019 (Farneti, AJSC) (NYSCEF Doc. No. 129), which Ordered, Adjudged and Decreed the above cited language, and importantly, hand-wrote the word "immediately" in the Decretal paragraph. The Court also struck from the Judgment defendants' claim that "this judgment has been satisfied in all respects."
Instead of immediately complying with the December 12, 2019 Judgment, the defendants "Laid on Table 4/28/2020" Resolution No. 547-2020 adopting Local Law No. 50-2020 (LL 50-2020, NYSCEF Doc. Nos. 102, 182):
TO TRANSFER EXCESS FUNDS IN THE SEWER ASSESSMENT STABILIZATION RESERVE FUND TO THE SUFFOLK COUNTY TAXPAYERS TRUST FUND AND TO ELIMINATE THE REQUIREMENT THAT INTERFUND TRANSFERS BE MADE FROM THE GENERAL FUND TO THE SEWER ASSESSMENT STABILIZATION FUND The legislative intent of the proposed local law expressed the financial issues arising from the COVID-19 pandemic and found that there were sufficient funds in the Sewer Assessment Stabilization Reserve Fund (ASRF) (see LL 50-2020, Section 1. Legislative Intent.).
The defendants set forth the following rationale for their actions:
The Legislature further finds that the $29,409,109 that is required to be transferred into the ASRF pursuant to a judgment dated December 12, 2019 by the Honorable Justice Joseph Farneti in the Matter of the Long Island Pine Barrens Society Inc., et al vs. County of Suffolk, et al is not needed in the fund, which contains a significant excess fund [*3]balance.
(LL 50-2020, Section 1. Legislative Intent.) (emphasis added).
The Local Law proposed amendments to Charter Article XII, adding a new Paragraph 5 to Subsection D, as follows:
(5) In Fiscal Year 2020 or in Fiscal Year 2021, forty-four million, four hundred nine thousand, one hundred nine dollars ($44,409,109), which shall include the twenty-nine million, four hundred nine thousand, one hundred nine dollars ($29,409,109) that was required to be paid into the Assessment Stabilization Reserve Fund by Judgment of the Honorable Justice Joseph Farneti dated December 12, 2019 in the Matter of the Long Island Pine Barrens Society Inc., et al vs. County of Suffolk, et al, shall be transferred and deposited in the Suffolk County Taxpayers Trust Fund created by this Article. This transfer and deposit shall be in addition to any other sum allocated and deposited to such fund pursuant to subdivision (C) of this section for enhanced county wide property tax protection. The appropriation for this transfer and deposit shall be effectuated via duly approved legislative resolution.
(LL 50-2020, Section 2. Amendments.).
The Local Law was made applicable "to all budgetary actions approved for, or occurring during any fiscal year beginning with January 1, 2020 and in all subsequent fiscal years" (LL 50-2020, Section 3. Applicability.). The Local Law would not take effect until it was approved by the electorate by referendum at the next general election, by the following proposition language, submitted to the voters:
SHALL RESOLUTION 2020, ADOPTING LOCAL LAW NO. 2020, A CHARTER LAW TO TRANSFER EXCESS FUNDS IN THE SEWER ASSESSMENT STABILIZATION RESERVE FUND TO THE SUFFOLK COUNTY TAXPAYERS TRUST FUND AND TO ELIMINATE THE REQUIREMENT THAT INTERFUND TRANSFER BE MADE FROM THE GENERAL FUND TO THE SEWER ASSESSMENT STABILIZATION FUND, BE APPROVED?
(LL 50-2020, Section 6. Effective Date. and Section 7. Form of Proposition.).[FN1]

The Local Law, after a public hearing, was approved on July 30, 2020, by defendant, then County Executive Steven Bellone.
After the November 3, 2020 general election, when the above described Local Law was approved by the voters, the defendants approved Resolution No. 971-2020 (NYSCEF Doc. Nos. 115, 183) authorizing the transfer from the Assessment Stabilization Fund (Fund 404), which Resolution set forth the following, pertinent provisions: 
WHEREAS, pursuant to an order of the Honorable Justice Joseph Farneti in the Matter [*4]of the Long Island Pine Barrens Society Inc., et al vs. County of Suffolk, et al, dated December 19, 2019 (the "Court Order"), the County is required to transfer $29,409,109 from the General Fund to the Assessment Stabilization Reserve Fund, in settlement thereof; and
WHEREAS, Resolution No. 547-2020 ... authorizes the transfer of $44,409,109 from the Assessment Stabilization Fund to the General Fund for Fiscal Year 2020 or Fiscal 2021, and which sum shall include, when transferred, the $29,409,109 required to be transferred pursuant to the Court Order; and ...
3rd RESOLVED, that the County Comptroller is hereby authorized, directed and empowered to transfer $29,409,109 from the General Fund (Fund 001) to the Assessment Stabilization Fund (Fund 404) in Fiscal Year 2020 pursuant to the Court Order; and be it further
4th RESOLVED, that the County Comptroller is hereby authorized, directed and empowered to transfer $44,409,109 from the Assessment Stabilization Fund (Fund 404) to the General Fund (Fund 001) in Fiscal Year 2021;
(Resolution No. 971-2020). Resolution No. 971-2020 was approved by defendant Bellone on December 21, 2020, a full year after the "immediately" directive in the Judgment.
Plaintiffs commenced this action on January 3, 2022, seeking to invalidate Local Law 50-2020 and Resolution 971-2020 since they believe that the local law abrogates the Judgment issued by the Court (Farneti, AJSC) in 2019. Additionally, they seek to enforce a prior Stipulation of Settlement reached with the County in 2014 (NYSCEF Doc. No. 107) requiring the County to pay back over $100 million taken from the DWPP fund and used for non-DWPP activities. Plaintiffs also raise an additional issue concerning the sewer tax rate for the Kings Park Sewer District #6.
The defendants moved to disqualify plaintiffs' counsel and to dismiss for failing to state a cause of action. In a well-reasoned Decision and Order, dated June 29, 2023, the Hon. Carmen Victoria St. George denied the motion to dismiss and clearly set forth the issues. This Court has decided to quote from that holding.
The 2019 Judgment is clear in its language that "defendants are directed to immediately take all actions and make all budgetary adjustments as are necessary to transfer $29,409,109 from the Suffolk County General Fund (Fund 001) to the Suffolk County Assessment Stabilization Reserve (Fund 404) and to conform all future Suffolk County operating budgets to Article XII of the Suffolk County Charter as adopted via mandatory public referendum."
The Stipulation entered into in 2014 was as the result of actions taken in 2013 whereby approximately $32.8 million was taken from Fund 404 and transferred to Fund 001. According to the plaintiffs, the settlement was reached because plaintiffs agreed that the County would not have to restore the funds in one lump sum but could restore the monies to Fund 404 by annual payments memorialized in each fiscal year's operating budget as a line item.
(Sup Ct, Suffolk County, June 29, 2023, St. George, J.).
The issue, in essence, is whether the challenged Local Law and Resolution can avoid compliance with the December 12, 2019 Judgment (Farneti, AJSC).
As set forth by the Hon. Carmen Victoria St. George, in denying the motion to dismiss:
...there is a significant dispute as to whether the defendants can abrogate the Judgment and the Stipulation by putting forth a referendum that controverts a judicial mandate and an agreement between the parties.
(id.).
The Court heard oral argument on March 14, 2025 as to the doctrine of finality of judgments (see Da Silva v Masso, 76 NY2d 436 [1990]; O'Brien v City of Syracuse, 54 NY2d 353 [1981]) and whether the defendants engaged in unjustifiable actions that constituted an abuse of administrative procedure, akin to the "special facts" exception to the time of decision rule (see Rocky Point Drive-in, L.P. v Town of Brookhaven, 21 NY3d 729 [2013]; Matter of Hampton, LLC v Rickenbach, 98 AD3d 736 [2012]). The Court will first consider the issues surrounding the transfer of the $29,409,109, as directed by the Second Department and the Judgment of Judge Farneti.
The $29,409,109 Judgment
In any examination of the Separation of Powers Doctrine, the Court must revisit the Federalist Papers, authored by the supporters of the Constitution of 1787, that is, Alexander Hamilton, James Madison and John Jay. While only six of the 85 essays discuss the role of the Judicial Department, in Paper No. 78, Hamilton explains the separation of powers between the different departments and notes that the judiciary:
. . . will always be the least dangerous to the political rights of the Constitution . . . The judiciary, on the contrary, has no influence over either the sword or the purse; . . . It proves incontestably that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the two; and all possible care is requisite to enable it to defend itself against their attacks. . . . For I agree that 'there is no liberty if the power of judging be not separated from the legislative and executive powers.'
(Federalist No. 78).
Hamilton then described the role of the judiciary in ensuring "the public justice and the public security":
The complete independence of the courts of justice is peculiarly essential in a limited Constitution. By a limited Constitution, I understand one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder; no ex post facto laws, and the like. Limitations of this kind can be preserved in [*5]practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.
(id.).
Finally, as noted by Hamilton, "[t]he interpretation of the law is the proper and peculiar province of the courts" (id.).
Here, in spite of and contrary to the direction of the Second Department orders and the Judgment of Judge Farneti, the legislative branch adopted and the executive branch approved a local law wherein the defendants determined that the Judgment need not be followed. That defiant determination was made less than four months after the issuance of the Judgment, which was to be effective "immediately." The end result of Resolution No. 971-2020, on December 21, 2020, was to leave the $29,409,109 in the general fund (Fund 001), by virtue of the 4th Resolved clause. The legislative and executive branches decided to adopt a local law to retroactively eviscerate the pre-existing Judgment.
The record before the Court shows that the Review of the 2021 Recommended Operating Budget, filed on October 26, 2020 (NYSCEF Doc. No.130), contained no monies to pay the Judgment from nearly a year earlier. Instead, it notes reversal of fund transfers ("This amount is comprised of the reversal of the transfer of $29.4 million from the General Fund to Fund 404 in 2020 as required by a legal judgment ..."]). There is no doubt the defendants determined not to return the Judgment sum to Fund 404.
Defendants claim that the 2022 Operating Budget has a line item for the transfer of the funds into Fund 404, which was made on January 15, 2021, as part of closing-out the year 2020 budget (see DeGiovine Affidavit, par. 29, NYSCEF Doc. No. 175). Defendants submit an affidavit that stated that the reason the transfer of funds does not appear in the prior budget is that "the 2020 Budget remained opened through February 2021. There was still conceivably transfers and revisions that might have occurred, after the February 16, 2021 certification" (DeGiovine Reply Affidavit, par. 7, NYSCEF Doc. No. 210). It is noted that the 2020 Adopted Budget was certified on April 15, 2020 (DeGiovine reply aff, par. 5).
However, at oral argument, defendants could not explain why the 2020 Adopted Budget, or even the 2019 Adopted Budget, could not have been modified to comply with the December 12, 2019 Judgment "immediately," as directed. If budgets can be modified as of February 16 of the next year, or even April 15, thereafter, there is no budgetary reason for not doing so with regard to the Farneti Judgment, only a political reason. The claim that the Judgment did not specify the specific year of transfer (DeGiovine reply aff, par. 10) is belied by the term of the Judgment — that is, "immediately."
As noted above by Alexander Hamilton, in discussing legislative exceptions, "it shall pass no bills of attainer, no ex post facto laws, and the like " (Federalist No. 78). The actions described herein rise to that level of legislative exception.
Retroactive application of statutes adopted by the legislative branch and ratified by the executive branch raises constitutional issues. The Founding Fathers make two references to "ex post facto" law-making prohibitions in Article l, Sections 9 and l0 of the U. S. Constitution. 
The constitutional argument arises from selective "legislative adjudication" of disputes [*6]which purport to overrule final orders of the Judicial Branch of government. It is well established precedent that a "final" non-appealable judgment of the courts is not disturbable under a res judicata theory (see Eaddy v US Bank Nat. Assoc., 180 AD3d 756 [2d Dept 2020]). The Farneti Judgment is such a final order which relied on the pre-2020 existing Tax Law and Suffolk Charter Law.
"It is elementary that a final judgment or order represents a valid and conclusive adjudication of the parties' substantive rights . . ." (Da Silva v Masso, 76 NY2d 436, 440 [1990]). Legal maxims such as law of the case and collateral estoppel serve to protect the sanctity and finality of litigated judicial orders and judgments, while the doctrine of res judicata does the same so for such orders and those issued upon default (see Richter v Sportsman Prop., Inc., 82 AD3d 733 [2d Dept 2011]; 83-17 Broadway Corp. v Debcon Fin. Serv., Inc., 39 AD3d 583 [2d Dept 2007]; Rosendale v Citibank, N.A., 262 AD2d 628 [2d Dept 1999]). 
These maxims are the root of the finality doctrine which has been characterized as: "[a] policy against relitigation of adjudicated disputes [that] is strong enough generally to bar a second action even where further investigation of the law or facts indicates that the controversy has been erroneously decided, whether due to oversight by the parties or error by the courts" (Reilly v Reid, 45 NY2d 24, 28 [1979], citing Deposit Bank v Frankfort, 191 US 499, 510-511 [1903] [emphasis added]). 
For example, the appellate courts have also determined that retroactively changing a statute of limitation which vitiates an existing valid cause of action impairs a vested right and is violative of "due process" (see Merz v Seaman, 265 AD2d 385 [2d Dept 1999]; Vogel v Lyman, 246 AD2d 422 [4th Dept 1998]), citing Ruffalo v Garbarini & Scher, P.C., 239 AD2d 8 [1st Dept 1998]).
Additionally, the Court notes that the New York Legislature itself has statutorily frowned upon retroactive application when it directed that "the legislature, however, may not enact retroactive statutes which will impair constitutional rights," i.e., impair the obligation of a contract or interfere with a vested right (see McKinney's Cons. Laws Vol. l, New York Statutes § 51(e), "Validity of Retroactive Statutes"; see also Danks v Quackenbush, 1 NY 129 [1848]; Philips v Agway, Inc., 389 NYS2d 977 [Sup. Ct. Cattaraugus Cty.1976]).
Judgments are final, unless reversed on appeal (see, e.g., Matter of Huia, 20 NY2d 568 [1960]). This Court can find no statutory power for a municipality to overturn a judgment, by local law, pursuant to the Municipal Home Rule Law (see 5 McQuillen on Municipal Corporations §§ 9:10; 10-20).
Defendants argue that they had the right to, in essence, ignore the Judgment by placing the $29,409,109 into Fund 404 and then immediately taking it out and returning it into the General Fund. Aside from the audacity of such an argument, it runs counter to the intention and wording of Suffolk Charter Law and the existing Tax Law, as shown below.
The 4th Resolved Clause of Resolution No. 971-2020 is declared to be null and void, in part, and $29,409,109 must be immediately returned to Fund 404, for uses in keeping with the express intent of the DWPP.
The 3% Sewer Rate Issue (Kings Park Sewer District #6)
In 1984, the State Legislature adopted an additional 1/4% sales tax for Suffolk County (see Tax Law § 1210-A). The law was adopted, in part, to stabilize sewer rates in the Southwest Sewer District and other districts (Tax Law § 1210-A(b) (i, ii, iii).
In 2007, the 1/4% sales tax was extended by another 17 years from 2013 to 2030. Components of the program were changed to reflect new priorities, that is:
31.10% for land acquisitions;
11.75% for water quality programs;
25.00% for sewer rate stabilization; and
32.5% for tax stabilization.
(see former Article XII § C12-2[D] [NYSCEF Doc. No. 230]).
The voters approved these changes. So, for instance, the 25% allocation for sewer rate stabilization is statutorily allocated to Fund 404-Assessment Stabilization Reserve Fund (Fund 404).
Importantly, Tax Law § 1210-A (d) that was controlling during the time in question requires that:
. . . the net collections from the tax imposed pursuant to subdivision (a) of this section for the period beginning December first, nineteen hundred eighty-eight and ending November thirtieth, two thousand thirty shall, upon payment to the county of Suffolk, be deposited in a special fund, to be designated as drinking water protection reserve fund, to be created by said county therefor separate and apart from any other funds and accounts of the county.
(former Tax Law § 1210-A [d] [emphasis added]).
Under said section, the monies deposited can only be appropriated for the four dedicated purposes. The defendants implemented Tax Law § 1210-A, by adding Article XII to the Suffolk County Charter — in particular, as relevant to the issue of sewer tax rate stabilization, Article XII § C12-2(D). Article XII was amended on various occasions, with the relevant amendment in 2014. Said provision allocated 25% of the 1/4% sales tax revenue for sewer rate stabilization:
D. Sewer taxpayers protection: 25% of the total revenues generated each calendar year for sewer district tax rate stabilization only in those instances in which the pertinent sewer district will experience an increase in rates of at least 3% in the aggregate for user charges, operations and maintenance charges, per parcel charges, and ad valorem assessments in the calendar year for which these sewer district tax stabilization revenues are being allocated. The Suffolk County Sewer Assessment Stabilization Fund is hereby created; 25% of the total revenues generated each calendar year by such sales and compensating use tax shall be allocated and deposited annually to this trust fund. The annual appropriation of such revenues shall be effectuated via duly enacted resolution of the County of Suffolk and shall not reduce the projected rate increase below 3% in the aggregate for user charges, operations and maintenance charges, per-parcel charges, and [*7]ad valorem assessments for the year in question . . .
(former Article XII § C12-2[D] [emphasis added]).[FN2]

This section defined "excess Assessment Stabilization Reserve Fund balance" as:
balances greater than needed for sewer district tax rate stabilization only in those instances in which the pertinent sewer district will experience an increase in rates of at least 3% in the aggregate for user charges, operations and maintenance charges, per-parcel charges, and as valorem assessments in the calendar year for which these sewer district tax stabilization revenues are being allocated.
(former Article XII § C12-2[D] [emphasis added]).
The "excess Assessment Stabilization Reserve Fund" must be certified each year and the excess funds can be spent on projects identified under C12-2(D) (2), (3) and (4), after paying for the Fund's intended sewer tax stabilization.
In construing the intended scope of the Charter provision, as with any statutory construction, the first step is the plain meaning of the statutory language, since it is the statutory text which is the "clearest indicator of legislative intent" (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1999]; see American Transit Ins. Co. v Comfort Choice Chiropractic, P.C., 229 NYS3d 514 [2d Dept 2025]; see also North Shore Cen. School Dist. v Glen Cove City School Dist., 236 AD3d 806 [2d Dept 2025]).
In a recent Second Department case, Bliss v Village of Southampton Bd. of Architectural Review & Historic Preservation, 236 AD3d 1017 (2d Dept 2025), the Court noted the importance of construing clear and unambiguous statutory language to effectuate the plain meaning of the words used as the clearest indicator of legislative intent.
Here, the wording seems quite clear and unambiguous. The fund is to be used for sewer district tax rate stabilization "in those instances in which the pertinent sewer district will experience an increase in rates of at least 3% in the aggregate for user charges, operations and maintenance charges, per-parcel charges, and as valorem assessments in the calendar year for which these sewer district tax stabilization revenues are being allocated" (former Article XII § C12-2[D]).
The "excess Assessment Stabilization Reserve Fund" is defined as the "balance greater than needed for sewer district tax rate stabilization . . . " (id.). Sewer rate stabilization is set forth as "an increase in rates of at least 3% . . . " (id.). It is clear that, under the then-existing Charter provision, the Assessment Stabilization Reserve Fund must be used to provide relief to sewer districts that experience rate increases of at least 3% over the prior calender year. Any rate [*8]increase above 3% triggers the use of the Fund for rate stabilization. Therefore, the defendants can offer needed sewer services, for protection of the groundwater, while using the Fund to limit increases in the sewer tax rate to 3% per year.
Article XII § C12-2 opens with the understanding that the funds "shall be allocated annually only in accordance with the following formula throughout this entire period of time" (former Article XII § C12-2) [emphasis added]).
It seems clear that under the express wording of the Suffolk Charter, the 25% of the 1/4% sales tax collected under Tax Law § 1210-A must be utilized for sewer rate stabilization, from the Sewer Assessment Stabilization Fund, before the excess remaining, after stabilization, can be deemed to be placed into the excess Assessment Stabilization Reserve Fund, to be used by the defendants for the additional purposes, set forth in the Charter.
Under this interpretation, it would be easy to persuade this Court to find that the final aggregate sewer rate cannot exceed 3% because any increase above 3% from the prior year's rate is automatically entitled to funds in the reserve — that is, the Assessment Stabilization Reserve Fund (ASRF). The record before the Court is replete with County Resolutions, Department of Public Works Reports or Budget Review Office Reports that reflect that same understanding (see, e.g., Review of the 2020 Recommended Operating Budget, October 11, 2019 [NYSCEF Doc. No. 147] ["The use of the ASRF enables the County to offer sewer services while limiting increases in tax rates and user fees to three percent per year."]; Review of the 2022 Recommended Operating Budget, October 8, 2021 [NYSCEF Doc. No. 149] ["The use of the ASRF enables the County to offer sewer services while limiting increases in tax rates and user fees to three percent per year, and enables sewer districts to avoid debt service costs related to bonding for capital improvements."]; Review of the 2023 Recommended Operating Budget, October 28, 2022 [NYSCEF Doc. No. 150] [using the same language as previously quoted from the Review of the 2022 Recommended Operating Budget]).
As often noted, while not determinative, "a contemporaneous interpretation of a statute is entitled to considerable weight in discerning legislative intent" (Matter of Knight-Ridder Broadcasting v Greenberg, 70 NY2d 151, 158 [1987]).
Plaintiffs challenge Resolution 247-2021 (NYSCEF Doc. No. 184), adopted on April 20, 2021, approving the Kings Park Sewer District Financial Plan (KPSD Financial Plan), which raises that district's rate more than 3% per year — that is, the aggregate sewer rate charges will exceed 3%, and in some years, substantially.
The defendants do not dispute that the sewer tax rate for the Kings Park Sewer District, for the years 2021-2022 and 2022-2023, exceeded a 3% annual increase (see, e.g., NYSCEF Doc. No. 85). Defendants argue, instead, that Kings Park is receiving a disproportionate share of relief from Fund 404. Yet, there is no such criteria set forth in Article XII. 
However, while this matter was under submission, the Second Department in Matter of Town of Riverhead v County of Suffolk, — NYS3d —, 2025 NY Slip Op 02209 (2d Dept 2025), focused on the wording of Tax Law § 1210-A which, as stated, authorizes the County to adopt a local law for the use of the 1/4% sales tax funds. The Second Department wrote:
Furthermore, Suffolk County Charter former §12-2(D) did not require the County to use its ASRF funds to stabilize the annual sewer rates of any sewer district within its borders [*9]to the extent that the rates did not increase by more than three percent irrespective of costs or other considerations. Notably, the Suffolk County Charter does not define "stabilization," and neither does the Tax Law, which explicitly leaves it up to the "county executive" as "approved by the county legislature" to determine "such amount or amounts .. as necessary ... in any given year" (Tax Law §1210-A[b][iii]). We note that this interpretation of the local law, which allows the County government to utilize its discretion in distributing ASRF funds, comports with at least 20 years of the County's practice (see generally Matter of Sabatino v Suffolk County, 74 AD3d at 827, 903 NYS2d 446). Thus, the Supreme Court correctly determined that the appropriation of ASRF funds, in this context, involves a discretionary function ...
This Court finds the citation to the Sabatino case to be unhelpful, since that matter concerned payments for accrued vacation time under an entirely different Code section (Suffolk County Administrative Code § 632-1[C]).
Moreover, it seems clear that under the provisions of the Municipal Home Rule Law, a local government can adopt Local Laws that are stricter than the provisions of an enabling state law. It appears the Town of Riverheadcase relies upon what is found to be discretion afforded by the Tax Law.
However, this Court must follow the direction of the Appellate Court, which has directly addressed this claim in its recent holding.
Notably, while the Suffolk County Charter mandated the 25% allocation into the Suffolk County Sewer Assessment Stabilization Fund and such, by Charter is mandatory, the subsequent appropriation of those funds has now been determined to be discretionary, at the will of the county legislature and executive, for any use, and in particular, for tax stabilization. In essence, the 32.5% set aside for tax stabilization, is a mere suggestion, and the 1/4% sales tax revenues can be used as dictated by the county legislature and executive, for discretionary purposes.
Based upon the recent appellate holding, this Court must hold that the Charter is to be read to be a "floor" or a preliminary "threshold" that must first be met before the defendants determine to award any funding, and that the defendants possess discretionary authority to transfer monies in the Fund to other non-listed purposes. Therefore, this Court must hold that the taxpayers of the Kings Park Sewer District #6 are not entitled to a 3% stabilization of the rate increase over the prior year, which is left to the discretion of the county legislature and executive.
While this may seem to run counter to the original intent of the DWPP in 1987 and diminish the importance and necessity of the 1/4% sales tax revenues to be dedicated to environmental protection, such is the will of the county legislature and executive.
In light of all of the above, to the extent that Resolution 247, as implemented, results in an aggregate sewer rate within Kings Park Sewer District #6, which exceeds a 3% rate increase over the pervious year's rate, for the years 2021-2022 and 2022-2023, it is declared to be a discretionary function of the defendants and the claim must be dismissed.
The Stipulation of Settlement
This Court fully understands that the power to set policy and to make appropriations is [*10]granted to the Suffolk County Legislature and the County Executive. The Court also understands that both are charged, by virtue of the New York State Constitution, State Law and Suffolk County Charter, with managing the County's finances and budgeting issues (that is, Hamilton's "the sword and the purse").
Suffolk County Resolution No. 928-2014 (the Bellone Settlement Agreement) (NYSCEF Doc. Nos. 107 and 108) permitted the defendants to borrow from the ASRF from 2014 until 2017, to provide property tax relief and required repayment commencing in 2018 and ending in 2029. In fact, the defendants repaid borrowed funds, pursuant to the Stipulation in 2018 and 2019 back into Fund 404. It is alleged that at that time, $154.2 million was still owed back to Fund 404.
However, part of Local Law 50-2020, as discussed above, eliminated any and all future scheduled payments back into Fund 404, thereby, as claimed by the plaintiffs, abrogating the Bellone Settlement Agreement. Just as Local Law 31-2014 was approved by public referendum, so was Local Law 50-2020.
With regard to the Stipulation of Settlement, it is noted that the Stipulation and the 2014 Charter Amendments did not prohibit the County from amending its Charter, particularly as provided for by public referendum, nor does it restrict the County from amending the DWPP, subject to the referendum requirement. Such is what occurred with the amendment of subdivision L and M of the Charter Law §§ C4-6 and C4-10, by the electorate on November 3, 2020. The repeal of the prior subdivisions happened, as required by the Charter and the Second Department, by a public referendum.
If the defendants and the plaintiffs intended to include such a restriction on future amendments, they could have. Yet, no such provision is to be found in the Stipulation of Settlement or the 2014 Charter Amendments.
The Court can find no support for plaintiffs' argument that the 2014 Charter Amendments could never be amended by future legislative action, particularly where the Charter provisions, subdivision L and M, contained no such restriction (see, e.g., Municipal Home Rule Law §§ 10, 11, 23, 24 and 33).
Plaintiffs argue that the Stipulation of Settlement is a valid, enforceable contract (see Martin v Harrington, 139 AD3d 1017 [2d Dept 2016]). The Court must disagree, for various reasons. The Court cannot agree that all the material terms necessary for an enforceable contract are present. The Stipulation was never signed by the parties and the Court cannot find a notice of discontinuance, as required by the Stipulation. More importantly, the stipulation was never submitted to the Court for signature to create an enforceable Court Order.
Returning to the role of the judiciary, as explained by Hamilton in Federalist No. 78, it is recognized that the judicial branch is "the weakest of the three departments of power." The exercise of judicial discretion and moderation is important, even when acting as the bulwark against legislative encroachments. As the Federalist Paper states:
The courts must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body. The observation, if it proved anything, would prove that there ought to be no judges distinct from that body.
(Federalist No. 78).
This Court can, and must, put aside any thoughts of WILL in the adjudication of the actions of the other branches of government in how the $150 million was transferred from the DWPP, in the exercise of their respective functions, and how the defendants ensured that such was accomplished. In the exercise of this Court's JUDGMENT, as detailed above, the branch of plaintiffs' summary judgment seeking nullification of the challenged local law, as it relates to the Stipulation of Settlement, must be denied, in its entirety.
This constitutes the decision and order of the Court.
Submit judgment on notice, in keeping with this determination.
DATED: May 20, 2025
THOMAS F. WHELAN, J.S.C.

Footnotes

Footnote 1:The ballot referendum does not state that it is overriding a Judgment of the Supreme Court.

Footnote 2:The Court notes that the word "shall" is usually construed by courts to be mandatory language (see, e.g., Doe v Garfinkel, 234 AD3d 929, 930 [2d Dept 2025], citing Giglio v NTIMP, Inc., 86 AD3d 301, 307—08 [2d Dept 2011] ["The language of the statute is strictly construed, as '[t]he language of CPLR 3215[c] is not, in the first instance, discretionary, but mandatory inasmuch as courts 'shall' dismiss claims (CPLR 3215[c]) for which default judgments are not sought within the requisite one-year period . . .'"]).